## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

DESEAN LAMONT THOMAS,                          Case No. 0:15-cv-02197-JRT-KMM

        Plaintiff,

v.

PASTOR JAMES BZOSKIE,                          **REPORT AND**
LIEUTENANT LAWERENCE HEART,                    **RECOMMENDATION**
DAKOTA COUNTY MN,
LIEUTENANT BENJAMIN VERBY,
CAPTAIN RICHARD SCHROEDER, and
COMMANDER DAN SCHEUERMANN,

        Defendants.

Desean Lamont Thomas, 228769, MCF-Rush City, 7600 525th Street, Rush City, MN 55069, pro se plaintiff

Helen R. Brosnahan, Esq., and Jeffrey A. Timmerman, Esq., Dakota County Attorney's Office, counsel for defendants

This matter is before the Court for a report and recommendation ("R&R") on cross-motions for summary judgment. *See* 28 U.S.C. § 636; D. Minn. LR 72.1. The plaintiff, Desean Lamont Thomas, seeks partial summary judgment. ECF No. 171. The defendants,[1] Pastor James Bzoskie, Lieutenant Lawrence Hart, Lieutenant Benjamin Verby, and Dakota County ask the Court to enter summary judgment in their favor. ECF No. 179. For the reasons that follow, the Court recommends that

---

[1]     Although Captain Richard Schroeder and Commander Dan Scheuermann are listed on the docket as defendants in the litigation, the Court concluded, in an August 11, 2016 Order, that Mr. Thomas's attempt to add claims against them was futile. ECF No. 112 at 11-14. Accordingly, there are no claims against Captain Schroeder or Commander Scheuermann in this litigation.

Mr. Thomas' summary-judgment motion be denied and the defendants' motion be granted.

## ALLEGATIONS IN THE COMPLAINT[2]

Mr. Thomas brings this lawsuit under 42 U.S.C. § 1983, which allows a person to sue another who, acting under color of law, violates that person's federal constitutional rights. Mr. Thomas claims that his First and Fourteenth Amendment rights were violated by the defendants during time he spent in custody at the Dakota County Law Enforcement Center (the "Jail"). Second Am. Compl., ECF No. 115. Mr. Thomas practices Islam. *Id.* ¶ B. He asserts that the defendants prevented him from practicing Islam freely and treated him less favorably than they treated other detainees because he is a Muslim.

Mr. Thomas was housed at the Jail between August 22, 2014 and November 4, 2015, while he was awaiting trial on criminal charges, and again at various times after May 15, 2015. Second Am. Compl. ¶ A. He asserts that he began having problems with members of the Jail's staff over religious discrimination and accommodation shortly after he arrived. *Id.* ¶ C. In September 2014, Mr. Thomas asked for permission to host or attend Islamic religious services and his request was referred to Pastor Bzoskie, the Jail's volunteer chaplain. *Id.* ¶ D. His request was denied because such "gatherings" were "banned." *Id.* Mr. Thomas also alleges that Lieutenant Hart was involved in the decision to ban Islamic gatherings in the Jail. *See* Aug. 11, 2016 Order at 9-10, ECF No. 112 (discussing claims against Hart); Ltr from Pl. to Menendez, Mag. J. (June 14, 2016), at 2, ECF No. 89.

According to Mr. Thomas, Pastor Bzoskie and Lieutenant Verby also "denied [him] access to traditional Prayer rugs, [K]ufis, prayer oil & other Islamic worship materials." *Id.* ¶ E. Because he did not have access to these worship materials, he was not able to practice his religion "with proper Islamic etiquettes" as each of these items "plays an important role in [his] [p]ractices." *Id.* Although Mr. Thomas was not allowed to conduct religious gatherings and possess certain worship materials, he alleges that members of "other religions, like Christians" were treated differently. Second Am. Compl. ¶ F.

As a result of these limitations on his religious practice, Mr. Thomas asserts that he "suffered physical, emotional & mental injuries." Second Am. Comp. ¶ L. Further, he explains:

---

[2]    The following description of Mr. Thomas's claims is introductory and not intended to reflect the Court's proposed findings for purposes of this R&R.

> Without the proper guidance by trained Muslim ministers, Life Long
> Muslims & Islamic Literature that would have been available at . . .
> Islamic gatherings, [he] misinterpreted certain Islamic practices which led
> to physical & other injuries including . . . Nutritional Deprivation that
> caused severe weight loss, severe weakness & other injuries.

*Id.*

As previously construed by the Court in this litigation, Mr. Thomas's pleadings
raise several constitutional claims. *See* Aug. 11, 2016 Order at 20-21. He alleges that by
preventing him from gathering with other Muslims in the Jail for communal worship,
Pastor Bzoskie and Lieutenant Hart violated his First Amendment right to free-
exercise of his religion. Further, Pastor Bzoskie and Lieutenant Hart violated his
Fourteenth Amendment equal protection rights because they permitted members of
other faiths to engage in communal worship. Mr. Thomas also alleges that Pastor
Bzoskie and Lieutenant Verby violated his First Amendment free-exercise rights by
preventing him from keeping Islamic worship materials in his cell. Finally,
Mr. Thomas alleges that in denying him these worship materials while giving members
of other religions preferential treatment, Pastor Bzoskie and Lieutenant Verby
violated his Fourteenth Amendment equal protection rights. Mr. Thomas seeks
significant compensatory and punitive damages from the defendants. Second Am.
Compl. ¶ L.

## MOTIONS FOR SUMMARY JUDGMENT

The defendants' motion for summary judgment asserts that Mr. Thomas has
not come forward with evidence sufficient to support his claims that they violated his
constitutional rights. Defs.' Br. in Supp. of Mot. for Summ. J. ("Defs.' Br."), ECF
No. 179. They contend that the undisputed evidence demonstrates that the Jail's
policies regarding religious gatherings and possession of certain religious worship
materials serve legitimate institutional goals, which defeats his free exercise claims. *Id.*
at 17-35. Further, they argue that Mr. Thomas's equal protection claims fail because
he has presented no evidence that the Jail's policies concerning detainees' possession
of religious worship materials and religious gatherings are the product of intentional
discrimination against Muslims. *Id.* at 36-37. The defendants also argue that significant
portions of the record on which Mr. Thomas relies in his own summary judgment
briefing should not be considered. Defs.' Resp. to Pl.'s Mot. for Summ. J. ("Defs.'
Resp."), ECF No. 184.

Mr. Thomas opposes the defendants' motion for summary judgment and seeks
partial summary judgment in his own favor. Pl.'s Mot. for Partial Summ. J ("Pl.'s
Mot."), ECF No. 171; Pl.'s Resp. to Defs.' Mot. ("Pl.'s Resp."), ECF No. 193. He

argues that the defendants acted on their anti-Islamic biases in denying him access to religious worship materials, prohibiting Islamic gatherings and communal worship, and treating him differently than they treated members of other religions because he is a Muslim. *See* Pl.'s Resp. at 5, 7; Pl.'s Mot. at 2. In his submissions, Mr. Thomas points to a number of items he has placed in the record, including numerous exhibits, witness statements, grievance forms from his time at the Jail, and other materials.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in favor of the nonmoving party, the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must demonstrate the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 322. When the moving party properly supports a motion for summary judgment, the nonmoving party must present admissible evidence showing that specific facts exist creating a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Wingate Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078-79 (8th Cir. 2008). When considering Mr. Thomas's motion, the Court views the record in the light most favorable to the defendants, and when considering the defendants' motion, the court must view the record in the light most favorable to Mr. Thomas. *Durand v. Fairview Health Servs.*, __ F. Supp. 3d __, 2017 WL 217649, at *4 (D. Minn. Jan. 18, 2017).

## DISCUSSION

### I.    The Factual Landscape

The defendants assert that much of the evidence relied upon by Mr. Thomas at this stage does not satisfy the admissibility requirement in Fed. R. Civ. P. 56(c). Before turning to the merits of the parties' dispute, the Court makes the following proposed findings with respect to the evidence properly before the Court. Rule 56(c) permits courts to consider transcripts of depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, and other admissible materials. Fed. R. Civ. P. 56(c)(1)(A). As Rule 56 makes clear, a formal affidavit is no longer required. A declaration compliant with 28 U.S.C. § 1746, may be used in place of an affidavit, but the statute still requires a statement to be "written, signed, dated, and certified as true and correct 'under penalty of perjury.'" *Banks v. Deere*, 829 F.3d 661, 668 (8th Cir. 2016).

## A. Inadmissible Witness Statements

The defendants contend that a number of witness statements Mr. Thomas has placed in the record should not be considered in determining whether summary judgment on any claim is appropriate. Several of these witness statements are unsigned, including:

- June 10, 2016 Statement of Latocha R. Thomas, ECF No. 98-1 at 25;
- May 15, 2016 Statement of Damien Lashaun Nelson, ECF No. 98-1 at 26;
- May 15, 2016 Statement of Gage James, ECF No. 98-1 at 26;
- May 11, 2016 Statement of Burch Sammie Lee, ECF No. 98-1 at 27;
- April 25, 2016 Statement of Mahkem Collins, ECF No. 98-1 at 28;
- June 11, 2016 Statement of Booker Jarrett, ECF No. 105 at 1.

Other statements provided by Mr. Thomas have been signed, but were not signed under penalty of perjury, nor were they sworn and notarized as affidavits. These include:

- April 24, 2016 Statement of Tyree Fouler, ECF No. 119 at 1;
- April 26, 2016 Statement of Deon Sinkfield, ECF No. 119 at 2;[3]
- August 12, 2016 Statement of Dominike Carter, ECF No. 119 at 3;
- August 23, 2016 Statement of Jason Lott, ECF No. 119 at 4;
- August 23, 2016 Statement of Booker Jarrett, ECF No. 119 at 5;
- August 24, 2016 Statement of Quantez Turnage, ECF No. 119 at 6;
- September 7, 2016 Statement of Brett Contreras, ECF No. 123 at 1-2.

These witness statements cannot be considered for purposes of summary judgment. They are not affidavits and they do not comply with the requirements of 28 U.S.C. § 1746 because they do not state that they are made under penalty of perjury. Therefore they are not admissible evidence for summary judgment purposes. *See Banks*, 829 F.3d at 667-68 (rejecting plaintiff's argument that district court erred in granting summary judgment to the defendant where the plaintiff relied on unsworn and unattested statements from the plaintiff's co-workers that did not comply with § 1746's requirements); *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001) (concluding that the favorable presumption to a non-moving party at summary judgment did not permit consideration of another inmate's written statement concerning the events alleged in the complaint); *see also Irish v. United States Dep't of Justice*, No. 11-cv-2703 (MJD/JJK), 2015 WL 1178072, at *6 n.3 (D. Minn. Mar. 3, 2015) ("[U]nsworn . . .

---

[3]     Mr. Thomas originally submitted Mr. Fouler's and Mr. Sinkfield's statements unsigned, ECF No. 98-1 at 28-29, but his later submission remedied that issue.

statement would generally be inadmissible hearsay for purposes of summary judgment.").

In a number of his filings, Mr. Thomas states that he is pro se and his motions for appointment of legal counsel have been denied on several occasions during this lawsuit. He invokes these facts in a declaration he filed in support of having his witnesses' statements considered by the Court. *See* ECF No. 192. Although the Court is sympathetic to the challenges Mr. Thomas faces as a pro se litigant, the court's authority in this arena does not extend to relieving him of the burden of submitting evidence in the required form. *See Risdal v. Nixon*, 589 Fed. App'x 801, 803 (8th Cir. 2014) (declaring that because a pro se plaintiff's "unsworn . . . statements were not properly submitted under Federal Rule of Civil Procedure 56(c)," the district court "erred, as a matter of law, in relying on those statements in denying the motion for summary judgment"); *Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987) ("Although Quam is entitled to the benefit of a liberal construction of his pleadings because of his pro se status, Federal Rule of Civil Procedure 56 remains applicable to Quam's lawsuit.").

Mr. Thomas has described, under penalty of perjury, the circumstances in which those witness statements were obtained. ECF No. 192.

> I acted as an investigator & created all summary statements consistent with what the witnesses recited to me during our interactions regarding this matter. Each summary submitted is only a summary of the witness's testimonies and each witness has agreed to testify in open Court to their experiences within the facility. All witnesses in interaction while they were reciting the occurrences @ the jail were animated and put it on their moms or their souls that what they were explaining to me had actually occurred. To put something on one's soul or mom means in Ebonics terms to swear that the matter he recites is consistent with the truth.

*Id.*[4] Mr. Thomas attempts to assure the Court that these witnesses' statements are reliable enough to be considered. However, nothing in the text of § 1746 or any legal

---

[4]     The Court expresses no opinion whether a witness statement substantially complies with § 1746 by invoking the declarant's mom or soul as evidence of the solemnity of his vow of truthfulness instead of a more traditional invocation of the penalty of perjury. However, here, Mr. Thomas' own assertion regarding the oath of truthfulness taken by the declarants is simply not enough. *Cf. Blumberg v. Gates*, No. 00-cv-05607 (AJWX), 2003 WL 22002739, at *1 & n.1 (C.D. Cal. Aug. 19, 2003)

*(footnote continued on following page)*

authority identified by the Court permits a litigant to vouch for the statement of a witness in such a manner, thereby rendering it appropriate summary judgment evidence. The Court will therefore not consider the statements listed in this section.[5]

### B. Other Witness Statements

Three of the witness statements Mr. Thomas has provided are signed, certify that they are accurate accounts, and include the requisite "under penalty of perjury" language. These include: (1) the September 27, 2016 statement of Archie Randle ("A. Randle Statement"), ECF No. 128; (2) the September 27, 2016 Statement of Cortez Foster ("C. Foster Statement"), ECF No. 129; and (3) the undated statement of Osman Bashir, ("O. Bashir Statement"), ECF No. 172 at 2.

Mr. Randle's statement indicates that: he is a practicing Muslim; in 2001 he was housed at the Jail while awaiting trial; and while there he was denied a prayer rug and a Quran. A. Randle Statement. Further, he states that "the Chaplin at that time was racist and biased against anything but Christian[s] and . . . the Chaplin and other Dakota County Staff made disturbing comments about Muslims after [the] September 11 attacks in NY." *Id.*

Mr. Foster indicates he was held at the Jail during parts of 2014 and 2015. C. Foster Statement at 1. While there he "witnessed mistreatment of Muslims," including denying requests for Jumu'ah while Christians were allowed "to have services." *Id.* He saw Lieutenant Verby "speak down on Islam in conversations with other officers saying 'The U.S. should carpet bomb the entire Middle East to get rid of Muslims.'" *Id.* Further, he states that at Pastor Bzoskie's "Bible Study and Church Service" he saw "constant ridicule of the Islamic faith and he admits to partaking in these

---

(*footnote continued from previous page*)
(stating that "one may not sign a declaration 'for' another" and indicating that a stamp may substitute for a declarant's own signature, but "not as a substitute for some other declarant").

[5]     The Court notes that Mr. Thomas has not demonstrated any barrier to obtaining the statements at issue in the proper form. Indeed, as explored below, three of Mr. Thomas's witness statements were made and signed under penalty of perjury, and are therefore being considered. The Court also notes that even if the excluded statements were considered in support of Mr. Thomas's positions, particularly the seven that were signed but not under penalty of perjury and come the closes to complying with § 1746, they are heavily duplicative of information already in the record, and would not alter the Court's recommendation.

conversations with the pastor and others who vocally showed their disapproval of the Islamic faith." *Id.* at 1-2.

In his statement, Mr. Bashir states that he is a practicing Muslim and was housed at the Jail during 2012. O. Bashir Statement. He "requested Islamic literature as well as other Islamic accom[modations] such as Jumu'ah but was denied." *Id.* He further asserts that "the Chaplin" was biased against him and other Muslims in the Jail and he was unable to practice his religion while at the Jail. *Id.*

As noted above, each of these statements is provided under penalty of perjury, certifies that the account of events described in the statement is accurate, and is signed. Mr. Randle's and Mr. Foster's statements are also dated, though Mr. Bashir's is not. Aside from the lack of a date on Mr. Bashir's statement, each of these statements is substantially compliant with 28 U.S.C. § 1746. Accordingly, the Court will consider these statements as part of the summary judgment record.

## II.    Free Exercise Claims

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const., amend I.[6] In his First Amendment free exercise claims, Mr. Thomas alleges that Pastor Bzoskie and Lieutenant Hart unconstitutionally prohibited Islamic gatherings including Jumu'ah and Islamic group studies. He also asserts that Pastor Bzoskie and Lieutenant Verby violated his rights by prohibiting him from possessing certain Islamic worship materials, including a Kufi, prayer rug, and sacramental prayer oils.

"Although prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights in light of the needs of the penal system." *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004). "An inmate who challenges the constitutionality of a prison regulation or policy that limits the practice of a religion must first establish that it infringes upon a sincerely held religious belief." *Hamilton v. Schriro*, 74 F.3d 1545, 1550 (8th Cir. 1996). If the regulation doe so,[7] the Court then considers four factors established in *Turner v. Safley*, 482 U.S. 78, 89-91 (1987), to determine if the regulation is "reasonably related to legitimate penological interests." *Murphy*, 372 F.3d at 982 (quotations omitted).

---

[6]    This prohibition also applies to the States. *See Cantwell v. Connecticut*, 310 U.S. 296 (1940).

[7]    Here, the Court assumes without deciding that the fact Mr. Thomas could not participate in Jumu'ah and was unable to congregate with other Muslims for religious group study placed a substantial burden on his ability to practice his religion.

First, we ask whether there is a valid rational connection between the prison regulation and the government interest justifying it. Second, we consider whether there is an alternative means available to the prison inmates to exercise the right. Third, we examine whether an accommodation would have a significant ripple effect on the guards, other inmates, and prison resources. Fourth, we evaluate whether there is an alternative that fully accommodates the prisoner at de minimis cost to valid penological interests.

*Id.* at 982-83 (internal citations omitted). The Court must "accord great deference to the judgment and expertise of prison officials, 'particularly with respect to decisions that implicate institutional security.'" *Id.* (quoting *Goff v. Graves*, 362 F.3d 543, 549 (8th Cir. 2004)).[8]

## A. Islamic Gatherings Claim[9]

There is no dispute that Mr. Thomas sought permission to meet with other Muslims within the Jail to participate in a religious gathering or worship service.[10] On September 16, 2014, for example, he sent a written request asking if Muslims in the facility would be allowed to participate in Jumu'ah, a Muslim congregational service held on Friday afternoons,[11] until officials could find an Imam to lead group services. Pl.'s Ex. 115, ECF No. 97 at 16. Mr. Thomas may have requested Jumu'ah from Pastor Bzoskie in person earlier, but this was his first written request. Dep. of Desean Lamont Thomas ("Thomas Dep.") 67:9-68:20. In response to this request,

---

[8]    These factors and the deference applicable to institutional judgments differ from the analysis applied when a person claims that a prison regulation violates his statutory rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA). *See Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (distinguishing between the test applied to First Amendment claims under *Turner* and that applicable to statutory claims under RLUIPA, and finding a prison failed to justify its policy prohibiting facial hair, which violated the stricter test under RLUIPA). Mr. Thomas has not asserted any RLUIPA claim in this case.

[9]    This free exercise claim is asserted against Pastor Bzoskie and Lieutenant Hart.

[10]    In the discussion below, the Court has considered the evidence relevant to the *Turner* factors in the light most favorable to Mr. Thomas.

[11]    *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 344 (1987) (explaining that "Jumu'ah is commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer").

Mr. Thomas was provided with a Quran and Jail staff offered to contact an Imam to come see him. *Id.* There also is no dispute that the Jail did not permit Mr. Thomas and other detainees to congregate on their own for such group religious worship or group religious study.

### 1. Rational Connection Between the Prohibition and the Government Interest

The Jail has a policy that prohibits detainees "from leading worship services or religious group study" across the board regardless of religion. Aff. of Capt. Richard Schroeder ("Schroeder Aff.") ¶ 9, ECF No. 180. The Jail follows this policy to avoid the possibility that detainees leading such groups could obtain positions of authority over other detainees or gain information about others that could be used to manipulate them. *Id.* ¶¶ 9-11. The Jail also believes that such a policy will prevent detainee leaders from using their position of power to promote or organize illegal activities. *Id.* ¶ 13. The Jail also determined that such a policy will prevent detainees from causing disturbances over doctrinal disputes. *Id.* ¶ 12. Within the Jail, "[a]ll worship services and religious group studies . . . are led exclusively by approved free-world volunteers. . . . No staff member or inmate has ever led a worship service or religious group study at the Jail." *Id.* ¶ 20. There is no dispute that no one from outside the institution volunteered to lead Jumu'ah or Islamic group studies for the Jail's detainees. *See* Aff. of Pastor James Bzoskie ("Bzoskie Aff.") ¶ 12, ECF No. 181.

The undisputed evidence shows there is a rational connection between the Jail's prohibition on detainee-led religious gatherings and the Jail's interest in preventing them. The institution has made the judgment that its policy helps maintain order and security in the facility, and the Court should defer to such institutional judgments. *See Murphy*, 372 F.3d at 983 (accepting statement from the Missouri Department of Corrections during litigation that its decision to prohibit members of the plaintiff's religious group from worshiping together was based on security concerns). The Supreme Court found similar justifications to be rationally connected to a prison's decision to deny a religious group worship rights in *O'Lone*. 482 U.S. at 351-52.

In a similar case in this District involving a correctional facility's policy of requiring volunteers from outside the institution to lead group religious activities, the court made the following observations:

> Defendants have detailed that the volunteer requirement has been implemented in order to prevent inmates from serving in supervisory positions over other inmates, so as to prevent potential conflicts through the creation of hierarchies among inmates. Courts have recognized that prison officials have an interest in preventing unsupervised group

activities and preventing inmates from holding leadership roles within a religious group, in order to maintain security and discipline within the prison.

*Jihad v. Fabian*, No. 09-cv-1604 (SRN/LIB), 2011 WL 1641885, at *19 (D. Minn. Feb. 17, 2011). The same is true here.

Mr. Thomas argues that "at the time of denial [of his request for Jumu'ah, Pastor Bzoskie] gave no explanation of why his denial was in the best interest of the facility. . . . Any contention articulated now would be highly doubtful . . . ." Pl.'s Mot. at 3. Mr. Thomas is arguing that the Court should not believe the justifications provided for the Jail's policy because they are post-hoc rationalizations. In addition to Mr. Thomas's failure to support this argument with any evidence, the Court sees no basis in the record to conclude that Pastor Bzoskie's alleged failure to share the rationale for the Jail's policy with Mr. Thomas calls into question the rationale now provided with the summary judgment motion.

During his deposition, Mr. Thomas testified that he has been able to participate in detainee-only religious studies at another institution. Thomas Dep. 24:11-21. However, this does not mean that the Jail's policy is not rationally connected to a legitimate objective at the Jail itself. *Cf. Fowler v. Crawford*, 534 F.3d 931, 941 (8th Cir. 2008) (observing that "evidence of policies at one prison is not conclusive proof that the same policies work at another institution" in context of a Religious Land Use and Institutionalized Persons Act case) (quotation marks omitted)).

In response to a question from counsel about prior practices at the Jail, Mr. Thomas also indicated that he was not aware the Jail used to allow detainees group time to pray together or that this practice was canceled due to lack of interest. *See* Thomas Dep. at 67:2-8. The Court concludes this is also not a basis to deny the defendants' summary judgment motion because the Court has found no authority supporting the proposition that a correctional facility forfeits any rational connection to legitimate interests where there is evidence that the institution changed its policy over time.[12]

---

[12]   As defendants correctly observe, Defs.' Reply, at 2-4, ECF No. 194, counsel's question itself during Mr. Thomas's deposition is not evidence that the Jail in fact had such a policy. The evidence from this portion of his deposition then boils down to Mr. Thomas's testimony that he was not aware the Jail did things differently in the past. In fact, the record suggests the Jail's prohibition on inmate-led worship services has been long-standing. Bzoskie Aff. ¶ 7 ("In my 37 years volunteering at the Jail, no

*(footnote continued on following page)*

For these reasons, the Court concludes that there is no genuine dispute with respect to the first *Turner* factor. The evidence demonstrates that the Jail's policy prohibiting detainees from leading religious services is rationally connected to legitimate government interests.

### 2.  Alternative Means for Exercising the Right

Addressing the second *Turner* factor, the Eighth Circuit has observed that a "prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so." *Murphy*, 372 F.3d at 983 (citing *Hammons v. Saffle*, 348 F.3d 1250, 1256 (10th Cir. 2003)). In *Murphy*, the court concluded that a prisoner had sufficient alternative means to practice his religion despite being prohibited from engaging in group worship because, "as a solitary prisoner [he] can still study the scriptures and [his religion's] materials, pray, occasionally meet with . . . clergy, observe holy days, and worship in other ways." *Id.* Similarly, in *O'Lone*, though there were "no alternative means of attending Jumu'ah," the Supreme Court found that the inmates retained the ability to participate in other Muslim religious ceremonies, to pray, to meet with an Imam, and to comply with Ramadan. 482 U.S. at 351-52; *see also Mansfield v. Missouri Dep't of Corrections*, No: 09-4171-CV-C-SOW, 2012 WL 12895645, at *3 (W.D. Mo. Sept. 7, 2012) (concluding on summary judgment that the second *Turner* factor weighed in the defendants' favor where the evidence showed the inmate plaintiffs had "the opportunity to read and study [religious] literature and the Bible, to pray or meditate, meet and communicate with clergy and spiritual advisors, and engage in religious activities in other ways").

Just like the plaintiffs in *O'Lone*, *Murphy*, and *Mansfield*, Mr. Thomas was not entirely prevented from engaging in the practice of his religion. He received more than one copy of the Quran, and kept multiple copies in case he met other inmates who did not have a copy or who wanted to convert to Islam. Thomas Dep. 69:5-70:5. An Imam, Samir Saikali, visited Mr. Thomas at the Jail twice. *Id.* at 37:4-13, 39:8-21; Schroeder Aff. ¶ 33. He and Imam Saikali discussed religion during their meetings, though they were not able to pray together. Mr. Thomas stated that Imam Saikali was not allowed to bring prayer rugs, a kufi, or other items into the Jail, but admits that Imam Saikali brought him a Quran and other Islamic reading materials. Thomas Dep. 53:7-25. Mr. Thomas was able to pray salat[13] in his cell. *Id.* at 76:17-19, 10:18-22.

---

(*footnote continued from previous page*)
inmate has ever led a worship service [or] a religious group study.").

[13]    There are five salat prayers—Fajr, Zuhr, Maghrib, Asr, and Isha—that practicing Muslims observe at specific times each day. *See* Thomas Dep. 24:3-9.

Mr. Thomas was able to fast for religious reasons, including reasons other than his observance of Ramadan. *Id.* at 92:1-25 (discussing reasons for fasting other than Ramadan). During his observance of Ramadan, though he was not always provided a hot meal, the Jail made arrangements to provide Mr. Thomas meals at the appropriate times of day. *Id.* at 112:11-113:24. He was also provided an extra towel to use as a prayer rug. *Id.* at 118:8-15.

Mr. Thomas contends that the defendants' reliance on evidence that Imam Saikali visited him at the Jail and was allowed to provide him religious literature is improper because such events occurred only after the defendants received the "whiff of [his] lawsuit." Pl.'s Resp. at 8-9. He argues that he was not adequately accommodated in the practice of his religion because their "actions were prompted by the filing of this lawsuit." *Id.* at 9. However, the articulation of the *Turner* factors does not call for consideration of the motivations for providing alternative means of worship. Moreover, although Imam Saikali apparently visited Mr. Thomas at the Jail after this lawsuit was filed in April 2015, the reasonable inferences from the evidence do not suggest that this only occurred due to a post-filing desire to hide previous interference with Mr. Thomas's religious practice.[14] In fact, Pastor Bzoskie offered to contact an Imam for Mr. Thomas as early as September 2014, over six months before this case began. Pl.'s Ex. 115 at 16 ("If you would like to see a Imam I will contact one to come see you.").

Taking all reasonable inferences in the light most favorable to Mr. Thomas, there is no genuine dispute for trial that he was permitted alternative means of practicing his religion. There is no evidence in the record to suggest that the Jail prohibited him from practicing his religion altogether, and he was able to engage in acts of worship and religious practice that are similar to those other courts have found sufficient under the second *Turner* factor.

### 3. The "Ripple Effect" of Accommodation, Alternatives, and Cost

The third *Turner* factor asks whether accommodating the request that the plaintiff be allowed to engage in a specific practice (here, detainee-led Jumu'ah and Islamic group study) would have "'a significant ripple effect' on the guards, other inmates, and prison resources." *Murphy*, 372 F.3d at 983 (quoting *Turner*, 482 U.S. at

---

[14]     The correspondence Mr. Thomas exchanged with Imam Saikali does not support his contention that his lawsuit caused the Imam to be contacted. The correspondence indicates that Imam Saikali "was contacted by Pastor Jim [Bzoskie] because Desean [Thomas] had requested to speak with an imam from the Muslim community." Pl.'s Ex. 339 at 3 (handwritten statement #4).

90). Addressing this factor in *Murphy*, the Eighth Circuit noted that "[a] decision by [the prison] to accommodate [the plaintiff's religious group] and grant group worship rights would place increased demands on correctional staff and could lead to even greater division and violence among all the prisoners." *Id.* at 984.

The fourth *Turner* factor requires a court to "evaluate whether there is an alternative that fully accommodates the prisoner 'at de minimis cost to valid penological interests.'" *Murphy*, 372 F.3d at 983. When considering alternative methods of accommodating a claimant's complaint about available religious practices, the Supreme Court has "rejected the notion that prison officials have to set up and shoot down every conceivable alternative . . . ." *O'Lone*, 482 U.S. at 350 (internal quotation marks and alterations omitted).

The defendants have presented evidence that the Jail does not have sufficient staff to supervise "inmate-led worship services or religious group studies while also maintaining all the other secular programs the Jail offers and ensuring institutional safety and security, which is the Jail's main objective." Schroeder Aff. ¶ 14. Allocating staff to supervise such religious gatherings would distract the Jail's correctional officers from their other duties. *Id.* ¶ 15. The Jail's correctional officers could not lead or otherwise "facilitate" such services or studies because they lack the necessary qualifications to do so. *Id.* ¶ 17. Providing such monitoring or facilitation would also potentially lead to increased demands on correctional officers' time as other groups "could demand equal congregational rights and treatment." *Id.* at 16. The Jail's concern that detainee-led worship services or group studies would jeopardize institutional security would remain even if correctional officers were simply present at any such services. *Id.* ¶ 18.

All congregational activities at the Jail are led exclusively by approved volunteers from outside the facility. Schroeder Aff. ¶ 20. "Pastor Bzoskie is a volunteer [and] [t]he Jail has never employed a religious leader of any faith." *Id.* ¶ 7. Pastor Bzoskie contacted Imam Saikali on Mr. Thomas's behalf. Bzoskie Aff. ¶ 9. He also contacted "other faith leaders and Islamic cultural organizations in an effort to locate an imam for Mr. Thomas," *id.* ¶ 10, and when that failed he attempted to find assistance through the Minnesota Department of Corrections, *id.* ¶ 11. Unfortunately, "[n]o volunteer offered to conduct Jumu'ah for Mr. Thomas at the Jail," and Imam Saikali declined an invitation to do so because of his responsibilities to his own congregation. *Id.* ¶ 12. No other volunteers agreed to meet with Mr. Thomas, to conduct Jumu'ah, or to lead Islamic group studies at the Jail. *Id.* ¶ 13.

Mr. Thomas asserts that representatives from Islamic groups Pastor Bzoskie testifies that he contacted for Mr. Thomas have told Mr. Thomas that the Pastor never reached out to them. To support this contention, he points to testimony he

14

provided in his deposition. Pl.'s Resp. at 6-7, 8 (citing Pl.'s Ex. 339 and Thomas Dep., p. 75). However, Mr. Thomas's deposition testimony about what others told him cannot be offered to prove the truth of those third parties' assertions; because those statements are inadmissible hearsay, they cannot create a genuine fact dispute at summary judgment.[15] *See Jones v. McNeese*, 746 F.3d 887, 899 (8th Cir. 2014) (finding that plaintiff's deposition testimony about third parties' statements to plaintiff conveying what the defendant said to them was "of no use to Plaintiffs in their efforts to defeat [the defendant's] summary judgment motion").

Mr. Thomas argues that the Jail could have offered other accommodations that would not have imposed significant costs on the institution. These proposals include: (1) providing instructional videos on Islamic issues to be played on televisions in the institution; (2) allowing access to the Jail's Skype system so Muslims could participate in Jumu'ah led by an Imam somewhere outside the facility; (3) having a Muslim correctional officer lead gatherings, services, or studies; or (4) offering non-denominational gatherings to be led by Pastor Bzoskie. Pl.'s Resp. at 11.[16]

However, neither Mr. Thomas' arguments regarding the availability of alternatives nor his factual averments in support of those arguments in his response create a genuine issue for trial. That the Jail could use the Skype software to stream live video from outside the facility does not demonstrate that anyone was willing to stream Jumu'ah services and the Jail's officials refused. In addition, even if Jumu'ah services taking place outside the institution could have been made available through Skype and instructional videos on Islam could have been viewed by Muslim detainees, Mr. Thomas offers no evidence that either could have happened without significant

---

[15]    Nor is Mr. Thomas's following statement in his brief sufficient to avoid summary judgment: "Plaintiff [and] Jasmine Conley contacted the Al-Huda C[enter] on a 3 way call [and] the entity claimed to never have spoken with the Pastor about a gathering or any such advisor coming to visit Plaintiff." Pl.'s Resp. 6-7. This is likewise inadmissible hearsay.

[16]    The Court notes that Mr. Thomas has stated in his memorandum in response to the defendants' motion for summary judgment that "[e]very contention put forth in this brief is an accurate transpiring of events that led to injuries," and he has signed that brief "under the penalty of perjury." Pl.'s Resp. at 3. Here, the Court assumes that Mr. Thomas's attempt to comply with the requirements of 28 U.S.C. § 1746 in submission of his opposition memorandum lends evidentiary value to portions of his responsive brief. *See Houser v. Folino*, No. 10-cv-0416, 2014 WL 3696130, at *8 (W.D. Pa. July 23, 2014) (observing that pro se plaintiff's factual averments made in various filings compliant with § 1746 were admissible for summary judgment purposes).

cost to legitimate penological interests. These technological fixes could present many of the same security risks of detainee-led religious gatherings identified by the defendants. Further, Mr. Thomas offers nothing more than speculation that the Muslim correctional officer he identified would be capable of leading Jumu'ah or conducting Islamic group studies. The only other evidence in the record on that issue suggests that the Jail's correctional officers are not trained or qualified to engage in such religious leadership, and having a Muslim correctional officer lead services would not resolve the institutional security concerns described in Captain Schroeder's affidavit. It is also worth noting that the Jail has no constitutional requirement to "set up and shoot down every conceivable alternative" that Mr. Thomas proposed. *O'Lone*, 482 U.S. at 350 (internal quotation marks and alterations omitted).

The undisputed evidence relevant to the third and fourth *Turner* factors weighs in favor of granting judgment as a matter of law to the defendants. The same concerns identified in Captain Schroeder's affidavit were found constitutionally sufficient to uphold the institution's policies in *O'Lone*, and they are equally sufficient here. 482 U.S. at 352-53 (accepting prison administrator's judgment that inmate-led Jumu'ah would place individual inmates in a leadership position over others, challenge institutional authority, and otherwise lead to "undesirable results" within the institution). Pastor Bzoskie's affidavit also establishes that the Jail made reasonable efforts to accommodate Mr. Thomas's requests, but simply could not find a volunteer willing or able to lead Jumu'ah or Islamic group studies at the Jail. *See Shepard v. Peryam*, 657 F. Supp. 2d 1331, 1347 (S.D. Fla. 2009) ("The fact that no Imam has contacted the institution, and that services have not been provided, does not amount to a constitutional deprivation.").

### 4. Conclusion

For the reasons discussed in this section, the Court concludes that the defendants have demonstrated there is no genuine dispute of any material fact and they are entitled to judgment as a matter of law on Mr. Thomas's claim that the defendants violated his free-exercise rights by prohibiting religious gatherings.[17] The undisputed evidence shows that the Jail's policy prohibiting detainee-led religious gatherings is reasonably related to legitimate penological interests. This conclusion applies equally to Mr. Thomas's individual and official-capacity claims. For the same reasons, Mr. Thomas's motion for summary judgment should also be denied; he has

---

[17]    Because the Court has concluded that the defendants are entitled to summary judgment on the record before it, it has not reached the question whether qualified immunity would shield Pastor Bzoskie or Lieutenant Hart from liability on this claim.

failed to provide any evidence demonstrating that the Jail's policy is not reasonable.

### B. Worship Materials[18]

Turning next to Mr. Thomas's claim that his First Amendment free exercise rights were violated when he was denied access to Islamic worship materials, there is no dispute as to several relevant facts. The Jail did not allow Mr. Thomas to wear a Kufi. The Jail also did not allow Mr. Thomas to keep sacramental prayer oils. *Id.* ¶¶ 25, 26. Further, a Jail policy prohibited Mr. Thomas from possessing a prayer rug.[19] *Id.* ¶ 25.

### 1. Substantial burden

The defendants argue that they are entitled to summary judgment on this claim because Mr. Thomas cannot show that the denial of these items substantially burdened his religion. Defs.' Br. 31-33. To establish a constitutional free exercise claim an inmate must show that an institutional policy substantially burdens his ability to practice his religion. *Gladson v. Iowa Dep't of Corrs.*, 551 F.3d 825, 833 (8th Cir. 2009).

> In order to be considered a substantial burden, the government action must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997) (quoting *In re Young*, 82 F.3d 1407, 1418 (8th Cir. 1996) (internal quotation marks and brackets omitted).

Mr. Thomas testified that not getting a Kufi "affected the Islamic etiquettes," and that wearing a Kufi "shows high regard for [Islamic] law." Thomas Dep. 122:7-12. He alleges the same in his Second Amended Complaint with respect to denial of the other worship materials at issue. Second Am. Compl. ¶ E ("denial of these worship materials deprived Plaintiff of practicing with proper Islamic etiquettes"). His amended pleading and testimony from his deposition provide little detail demonstrating that he was significantly inhibited from engaging in conduct

---

[18]    This free exercise claim is asserted against Pastor Bzoskie and Lieutenant Verby.

[19]    Mr. Thomas was allowed to have an extra towel that he could use as a prayer rug, but it was not an actual prayer rug. Thomas Dep. 119:13-20.

manifesting a central tenet of his religious beliefs, meaningfully curtailed from expressing adherence to his faith, or denied a chance to engage in the fundamental activities of his religion. In his summary judgment submissions, he offers no other evidence that would show such a substantial burden.

A number of courts have found that prison regulations imposing similar prohibitions on possession of worship materials do not constitute a substantial burden on the practice of religion where an inmate has not established such a burden exists. *See Hodgson v. Fabian*, 378 Fed. App'x 592, 593 (8th Cir. 2010) ("We agree with the district court that Hodgson did not establish that either his ability to keep prayer oils in his cell or a delay in receiving his religious mail substantially burdened his religion."); *Jihad v. Fabian*, 680 F. Supp. 2d 1021, 1027 (D. Minn. 2010) (concluding that plaintiff "presented insufficient evidence to support a finding that . . . policies [prohibiting him from wearing a Kufi or displaying an Islamic medallion while outside his cell] substantially burden"); *Hudson v. Dennehy*, 538 F. Supp. 2d 400, 411-12 (D. Mass. 2008) (concluding, under RLUIPA, that denial of a prayer rug with permitted use of a prayer towel did not substantially burden prisoners' ability to perform salat). However, the Court need not resolve whether Mr. Thomas's failure to present more detailed evidence concerning the alleged substantial burden on his ability to practice his religion entitles the defendants to summary judgment. Even assuming that the identified prohibitions impose the required burden, there is no genuine dispute that the Jail's policies prohibiting these worship materials are reasonably related to legitimate government interests.

### 2. *Turner* factors

The uncontroverted evidence demonstrates that the Jail's prohibition on headwear, possession of prayer rugs, and possession of prayer oils are reasonably related to legitimate penological interests. There is no genuine dispute that: (1) a rational connection exists between the Jail's policies prohibiting detainees from having headwear and from possessing sacramental prayer oil and prayer rugs in their cells; (2) Mr. Thomas was afforded other means of worship; (3) accommodating Mr. Thomas's requests would have a significant ripple effect on the Jail's administration; and (4) alternatives would impose more than de minimis costs to penological interests. Mr. Thomas has not identified evidence that creates a genuine issue for trial regarding any of these factors.

Under the Jail's policies, "all forms of inmate headwear are prohibited at the Jail." Schroeder Aff. ¶ 22. The Jail prohibits headwear for security reasons, including preventing detainees from "hiding weapons or other contraband in headwear; from using headwear as a symbol of gang affiliation or a tool to barter for goods, contraband, or favors; and from using headwear to conceal themselves from security

cameras." *Id.* ¶ 23. The Jail prohibits prayer rugs and religious oils as well. *Id.* ¶ 25. This policy is designed to prevent prayer rugs from being used to "conceal or smuggle contraband or as a weapon when rolled-up." *Id.* With regard to religious oils, the Jail concludes that their presence would create security risks. *Id.* ¶ 26. Captain Schroeder explains that:

> there is a risk that contraband could be hidden in religious oils, they are potentially flammable and thus pose a fire hazard, they could be used by inmates as a weapon to throw at correctional officers or other inmates, they could be used to escape from restraints or lubricate cell walls or doors, and they could be used by inmates as a means of bartering.

*Id.* ¶ 26.

Moreover, the defendants have presented evidence that "[u]pon request inmates are provided an extra pillowcase to keep in their Jail cells for use as a head cover when praying." *Id.* ¶ 24. Similarly, "[i]n lieu of prayer rugs, inmates are provided an extra towel to keep in their Jail cells to use for prayer upon request." *Id.* ¶ 25. The Jail also provides detainees with religious texts, including the Bible and the Quran. *Id.* ¶ 21. However, the Jail has determined that it would not be feasible to distribute "[K]ufis, prayer rugs, and prayer oil to Muslim inmates for use during daily prayer" because doing so would create security risks by taking correctional officers away from their other duties five times a day to distribute and collect the worship materials. *Id.* ¶ 28. It would also increase one-on-one interactions between detainees and correctional officers, increasing the chances for disputes to arise. *Id.* ¶ 29.

These policies prohibiting headwear and possession of prayer rugs and religious oils are rationally connected to the Jail's interest in maintaining security, and as described above, *see supra*, at p. 10, courts generally defer to such institutional judgments. Mr. Thomas was provided with alternative head coverings and an additional towel to substitute for his desire to possess a Kufi and a prayer rug, and as noted above, *see supra*, at p. 11-12, he was afforded substantial other opportunities to practice his religion. The undisputed evidence also demonstrates that suggested alternative means of accommodating Mr. Thomas's interest in using these materials in his religious practice could have had a substantial ripple effect on the Jail's administration by taking guards away from their other responsibilities and jeopardizing institutional security. For these reasons, the *Turner* factors all weigh in favor of granting the defendants' motion for summary judgment.

Other courts have reached similar conclusions in cases involving alleged free exercise violations due to policies restricting access to Islamic worship materials. *See AlAmiin v. Morton*, 528 Fed. App'x 838, 843-45 (10th Cir. 2013) (upholding prison's

ban on prayer oils in light of evidence of security concerns under stricter RLUIPA test); *Shepard*, 657 F. Supp. 2d at 1352 (concluding that a prison policy banning prayer rugs was constitutional where it was "clearly reasonably related to a valid governmental security concern," including preventing concealment of contraband, and there was a "ready alternative to use of a normal prayer rug" including the prison's towel exchange program); *Hudson v. Maloney*, 326 F. Supp. 2d 206, 209 n.2 (D. Mass. 2004) (concluding that a prison's ban on prayer rugs passed the test of *Turner* in light of security concerns, including concealment of contraband); *Sutton v. Stewart*, 22 F. Supp. 2d 1097, 1102-06 (D. Ariz. 1998) (analyzing prison policies limiting locations where inmates could wear a Kufi and prohibiting possession of prayer oils according to the *Turner* factors and concluding that the prison's policies were constitutional).

Mr. Thomas's arguments do nothing to change the Court's conclusion that there is no genuine issue of material fact with respect to his free exercise worship-materials claims.[20] In his response to the defendants' motion, Mr. Thomas contends that the towel provided to him was not a proper substitute because it was not a "brand new towel" and the sheet provided to him as a substitute head covering for prayer was "not a brand new sheet." Pl.'s Resp. at 11. Beyond his conclusory statements, however, Mr. Thomas has offered no admissible evidence that his religious practice requires use of a new towel. He also offers no evidence concerning what cost this would impose on the Jail.

Mr. Thomas next asserts that although he was provided an extra pillowcase for use as a head covering during prayer, the defendants removed that pillowcase from his cell on June 21, 2015. Pl.'s Mot. at 4-5 ("Regarding the kufi defendants blatantly lie in their discovery motion [c]laiming that they allowed Plaintiff to use a pillow case in lieu of a kufi. . . . [D]efendant's [sic] confiscated a pillow case and cleaning materials I attempted to use during prayer."). Captain Schroeder indicates "that a pillowcase that was torn and had frayed edges was removed from Mr. Thomas's cell on June 21, 2015, in connection with a shakedown of his cell that uncovered contraband and resulted in his placement in disciplinary lockdown." Schroeder Aff. ¶ 36. There is no dispute the pillowcase was removed by a correctional officer who does not appear to be a defendant in this litigation, nor a dispute regarding the condition of the pillowcase. Mr. Thomas points to his Exhibit 334 that appears to be a page from the

---

[20]    Mr. Thomas states in his response to the defendants' summary judgment motion that he was "not allowed to observe any Islamic holidays such as the two Eid's [sic]." Pl.'s Resp. at 12. However, his pleadings in this action offer no indication that his rights were violated by any prohibition on observance of these holidays. The Court will, therefore, not address this assertion further.

Jail's log, which confirms that a torn pillow case he was using when he prayed was taken from his cell and deemed contraband by a member of the Jail's staff. ECF No. 143 at 10. Even taking this evidence in the light most favorable to Mr. Thomas, a reasonable juror could only conclude that the removal of the torn pillowcase was reasonably related to the Jail's contraband prohibitions and could not subject any of the named defendants to liability.

Next, Mr. Thomas asserts that he should have been provided a Kufi to wear to court visits, for Friday prayer, and on holidays for "[s]hort time periods," and that prayer oils could have been provided "once a week." Pl.'s Resp. at 12. Again, Mr. Thomas provides no evidence to establish that these proposed alternatives were reasonable and imposed only a slight cost to penological interests. Instead, his argument consists of conclusion and speculation. The Jail's officials were not required to "shoot down every conceivable alternative method of accommodating [Mr. Thomas's] constitutional complaint." *See Turner*, 482 U.S. at 90-91.

Mr. Thomas further argues that the Jail's assertion that requiring distribution of materials for daily prayer would jeopardize security or would have been infeasible rings hollow because correctional officers "enter [the] unit every 30 minutes," bring in a "TV remote every hour," bring in newspapers, "pass out razors every night," and the "[t]ray slot system would have minimized all danger referring to interactions." Pl.'s Resp. at 12. These arguments overlook the fact that undisputed evidence in the record shows that distribution of worship materials in the same manner as these other items would impose additional burdens on the Jail and its staff. *See Pressley v. Beard*, 266 Fed. App'x 216, 219 (3rd Cir. 2008) (upholding district court's conclusion that an inmate's proposed alternatives "such as passing out prayer rugs five times a day, would impose a burden on the prison and could potentially expose the staff to additional risks"). If anything, requiring the Jail's staff to distribute and collect religious worship items five times a day would substantially increase the work required of the correctional officers, thereby imposing greater costs on the institution.

### 3. Conclusion

For these reasons, the Court finds that there is no genuine dispute that the Jail's prohibitions on headwear, possession of prayer oils, and possession of prayer rugs are reasonably related to legitimate government interests. Because there is no genuine fact dispute, the defendants are entitled to judgment as a matter of law on Mr. Thomas's official-capacity and individual-capacity claims concerning denial of Islamic worship materials.[21] For these same reasons, the Court concludes that Mr. Thomas has failed

---

[21]    Again, the Court need not reach the issue of qualified immunity. *See, supra* n.14.

to show he is entitled to judgment as a matter of law on these claims and his motion for summary judgment should be denied in this respect.

## III.    Equal Protection Claims

Mr. Thomas also claims that his right to equal protection of the law was violated during his time at the Jail. He asserts that the defendants treated him differently and less favorably than other detainees at the Jail who practiced Christianity because he is a Muslim. He alleges that while he was denied the opportunity to participate in Jumu'ah and Islamic group studies, Christians were permitted to have religious gatherings. He further asserts that Christians were allowed to have religious worship materials, while he was denied that accommodation.

### A. Legal Standard

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. "The heart of an equal protection claim is that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest." *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc). "For a claim of discrimination based on religion, a prisoner must show that he is 'denied a reasonable opportunity to pursue [his] faith as compared to inmates of other religions.'" *Jihad*, 680 F. Supp. 2d at 1041 (quoting *Runningbird v. Weber*, 198 Fed. App'x 576, 578 (8th Cir. 2006) and citing *Cruz v. Beto*, 405 U.S. 319, 322 (1972)).

The first question in such a case is whether the inmate is "in fact similarly situated to the other groups he claims were accommodated." *Murphy*, 372 F.3d at 984. "To survive summary judgment, [the plaintiff] must identify the characteristics of the class he claims to be similarly situated to and present some evidence that other groups within the class were not also restricted in similar ways." *Id.* "If there is no evidence to support the claim that valid prison restrictions were applied unequally, then summary judgment is appropriate." *Id.*

If an inmate can show he is similarly situated to others, he also "must show not just that he was treated differently but that the prison's actions were motivated by intentional and purposeful discrimination." *Hodgson v. Fabian*, No. 08-cv-5120 (JNE/SRN), 2009 WL 2972862, at *14 (D. Minn. Sept. 10, 2009), *aff'd* 378 Fed. App'x 592 (8th Cir. 2010). "General allegations about other religious groups being treated more favorably are not sufficiently specific to support an equal protection claim." *Id.* (citing *Runningbird*, 198 Fed. App'x at 578).

### B. Analysis

#### 1. Statements Allegedly Demonstrating Intentional Discrimination

In support of all of Mr. Thomas's equal protections claims, he relies on certain information to show that intentional discrimination was behind the defendants' allegedly unconstitutional conduct. Mr. Thomas asserts that Islamophobia has grown in America since the September 11, 2001 attacks, and it was the "motivating force" behind the defendants' conduct that led to his alleged injuries. *See* Pl.'s Resp. at 4, 11; *see also* Pl.'s Mot. at 2, 7. These conclusory statements are insufficient to show that the defendants' alleged disparate treatment was motivated by intentional discrimination. *See Armour & Co. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993) ("Conclusory affidavits do not provide a basis upon which to deny motions for summary judgment."); *Hodgson v. Fabian*, 2009 WL 2972862, at *14 ("General allegations about other religious groups being treated more favorably are not sufficiently specific to support an equal protection claim."); *see also Junaid v. Kempker*, No. 4:04-cv-57 CDP, 2009 WL 881311, at *9 (E.D. Mo. Mar. 27, 2009) ("Junaid cannot defeat summary judgment merely by pointing to his own conclusory and unsupported assertions in his affidavit.").

Mr. Thomas also points to witness statements he has submitted during the course of this lawsuit that he argues show the defendants' intent to discriminate against Muslims. *See, e.g.*, Pl.'s Mot. at 2 (referencing witness statements); Pl.'s Resp. at 7, 18 (same). As discussed above, the majority of the witness statements he has offered are not admissible evidence and, as a result, cannot be considered in opposition to the defendants' motion for summary judgment. *See supra*, at p. 4-7. Even those statements that are likely admissible, however, do little to support Mr. Thomas's claims of intentional discrimination by any of the defendants. Mr. Randle states that Pastor Bzoskie was biased against non-Christians and made disturbing comments about Muslims after the September 11th attacks in New York. Similarly, Mr. Foster states that Muslims were denied requests for Jumu'ah while Christians were allowed to have services and that Lieutenant Verby and Pastor Bzoskie made offensive comments about Muslims. Mr. Bashir states that he was denied Islamic literature and did not receive Jumu'ah and that Pastor Bzoskie was biased against him and other Muslims in the Jail.

These individuals' conclusory statements about perceived bias or discriminatory intent do not set forth specific facts showing a genuine issue for trial, but rather speculate as to the defendants' state of mind. *See Mann v. Yarnell*, 497 F.3d 822, 827 (8th Cir. 2007) (finding that the plaintiff could not withstand summary judgment in an excessive force case where the speculative evidence he offered amounted to "mere allegations, unsupported by specific facts or evidence beyond [his] own conclusions")

(alterations and quotation marks omitted); *see also Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 461 (7th Cir. 2014) (explaining that evidence speculating about an employer's state of mind in an age discrimination case was not sufficient to create a material dispute of fact in an effort to defeat a motion for summary judgment).

Admittedly, some of Mr. Randle's and Mr. Foster's statements are more specific, and if true they suggest that certain defendants harbor negative feelings about Islam. They remain insufficient to demonstrate that the defendants took the actions specifically at issue in this case because of animus towards Mr. Thomas's religion. Mr. Randle states that Pastor Bzoskie made disturbing comments about Muslims in 2001, and Mr. Foster states that Pastor Bzoskie ridiculed Islam and that Lieutenant Verby believed the United States should bomb the Middle East to get rid of Muslims. Mr. Thomas also asserts that Lieutenant Verby "made disturbing comments about Muslims[, and] [d]enied Muslims accurate accommodation." Pl.'s Resp. at 7. However, despite how offensive and inexcusable such remarks are, to be sufficient to sustain a prisoner's equal protection claim at summary judgment, they must be made by a decision maker, around the time of a challenged decision, and in reference to a challenged decision. *See Amawi v. Walton*, No. 3:13-cv-00866-JPG-RJD, 2016 WL 7364768, at *7-8 (S.D. Ill. Nov. 17, 2016) (applying "stray remarks" concept from employment discrimination context to a Muslim inmate's § 1983 equal protection claim and granting judgment as a matter of law for the defendants). Here, though Pastor Bzoskie and Lieutenant Verby were allegedly decision makers, the evidence concerning the derogatory comments attributed to them does not show that such comments were made in reference to any decision that disallowed Jumu'ah or Islamic group studies, or denied Mr. Thomas a Kufi, prayer oil, or a prayer rug. Nor would they allow a reasonable juror to conclude that the challenged decisions are a result of animus as opposed to legitimate jail policies.

### 2. Muslim Gatherings[22]

The defendants are entitled to summary judgment on Mr. Thomas's equal protection claims involving religious gatherings because Mr. Thomas has offered no evidence that would allow a reasonable jury to conclude that he was denied Jumu'ah or Islamic group studies because of intentional discrimination. The defendants have presented evidence, which Mr. Thomas has failed to challenge through admissible contrary evidence of his own, that the Jail has a neutral policy of prohibiting detainee-led religious gatherings. Schroeder Aff. ¶ 9. The defendants have also provided

---

[22]    This equal protection claim is asserted against Pastor Bzoskie and Lieutenant Hart.

evidence that the Jail allows religious gatherings, regardless of the religion involved, where a volunteer from outside the Jail offers to lead the gathering. *Id.* ¶ 20. Where the policies at issue apply to adherents of all other religions, there is no equal protection violation. *See Aziz v. Groose*, 74 F.3d 1243, 1243 (8th Cir. 1996) ("Everything about which [the plaintiff] complains applies to adherents of all other religions . . ., [t]hus there was no equal protection violation.").

It is undisputed that during Mr. Thomas's time at the Jail there was never a Jumu'ah service or a volunteer-led Islamic group studies class. It is also undisputed that volunteers lead a weekly nondenominational Christian service at the Jail. *See* Schroeder Aff. ¶ 20; Pl.'s Mot. at 6 (referring to opportunities for Christians to practice religion with advice of spiritual leaders). However, that disparity alone is not sufficient to support Mr. Thomas's equal protection claim as there is no evidence that Islamic gatherings were denied because of intentional discrimination. The defendants' uncontroverted evidence shows that despite Pastor Bzoskie's efforts to contact Islamic "faith leaders" and "cultural organizations," or seek other assistance in finding a volunteer to accommodate Mr. Thomas's requests, Bzoskie Aff. ¶¶ 10-11, no volunteer from outside the Jail offered to lead Jumu'ah or Islamic group studies for the Muslim detainees, *id.* ¶¶ 12-13. Nor has Mr. Thomas offered any evidence to contradict Pastor Bzoskie's sworn statement that in thirty-seven years as the Jail's chaplain, "no volunteer has ever offered to conduct Jumu'ah or Islamic group study at the Jail." *Id.* ¶ 14. If anything, this evidence supports the inference that Pastor Bzoskie attempted to accommodate Mr. Thomas's requests, rather than purposefully discriminate against him because he is a Muslim.

Mr. Thomas also asserts that Lieutenant Hart interfered with Imam Saikali's entry into the facility, but allowed Christian religious advisors to enter the facility without having to wait. Pl.'s Resp. at 7. In support of these assertions, he cites to an electronic communication between him and an unidentified member of the Jail staff (apparently the staff member is Pastor Bzoskie), in which he was informed that Imam Saikali came to visit him on a Friday, "but could not stay long enough to see [him] that day" and would return one day the following week. Pl.'s Ex. 108, ECF No. 97 at 9. Mr. Thomas also cites an email Lieutenant Hart sent to staff members stating, "[p]astors who have been cleared by Pastor [Bzoskie] will be allowed access into this facility twenty-four hours a day, seven days a week. I don't want to hear that a Pastor was made to wait in the lobby until lockdown was over." Pl.'s Ex. 133, ECF No. 97 at 34. Mr. Thomas argues that this evidence demonstrates Lieutenant Hart was unwilling to remove barriers to Islamic religious leaders entering the facility, but treated Christian advisors more favorably. Pls.' Resp. at 7. However, taken in the light most favorable to Mr. Thomas, this evidence does not show that any defendant treated him differently than similarly situated Christian inmates because of his religion.

There is no indication that Imam Saikali was forced to wait longer to get into the Jail than any Christian advisor. Indeed, there is no indication how long Imam Saikali waited at all. Nor has Mr. Thomas offered anything other than conjecture to support his contention that Imam Saikali was unable to enter the facility that day based on intentional discrimination.

### 3. Worship Materials[23]

Similarly, the defendants are entitled to judgment as a matter of law on Mr. Thomas's equal protection claim concerning denial of Islamic worship materials. He has offered no evidence from which a reasonable jury could conclude that he was denied such materials because of intentional discrimination while similarly situated detainees from other religions were permitted comparable worship materials. The defendants have shown that the Jail has neutral, safety-based policies that prohibit detainees from donning headwear, possessing prayer oil, and possessing prayer rugs. Schroeder Aff. ¶¶ 22-26. These prohibitions "apply to all inmates regardless of faith." *Id.* ¶ 27. Mr. Thomas has not contradicted that showing with admissible evidence. *See Aziz*, 74 F.3d at 1243 ("Everything about which [the plaintiff] complains applies to adherents of all other religions . . ., [t]hus there was no equal protection violation.").

He also asserts that Lieutenant Verby "refused to comply" with a number of formal and informal grievances and violated a "religious contract." Pl.'s Mot. at 5. His reference to a "religious contract" refers to grievance forms answered by Lieutenant Verby, but these forms reference preparation of meals and a change-of-cell request; they have nothing to do with Mr. Thomas's equal protection claims as asserted in this litigation. Pl.'s Ex. 323, ECF. No. 143 at 1-2.

Mr. Thomas also states that "Christians were able to wear rosaries," which are strings of beads for keeping count during certain Christian devotional prayers, while Muslims were prohibited from wearing Kufis.[24] Pl.s' Resp. at 10. The reasonable

---

[23]    This equal protection claim is asserted against Pastor Bzoskie and Lieutenant Verby.

[24]    The defendants argue that Mr. Thomas is "mistaken," Defs.' Reply at 5, and point to Commander Dan Scheuermann's affidavit testimony that "[i]nmates at the Jail are not allowed to possess or keep rosary beads, and were not allowed to do so when Desean Thomas was incarcerated at the Jail." Scheuermann Aff. ¶ 2, ECF No. 195. However, the defendants' implicit argument that that the Court can properly grant summary judgment due to the plaintiff's alleged "mistake" about a fact that the parties dispute is at odds with summary judgment practice. Nevertheless, the defendants are entitled to summary judgment for the reasons stated.

inference from Mr. Thomas's statement is that he observed Christians within the Jail with rosaries. However, the assertion that "Christians were able to wear rosaries" is not evidence that the Jail had a policy allowing their use. The material fact here is not whether Christians somehow had rosaries in the Jail, but whether the Jail *allowed* Christians to have items when denying similar materials to Muslims without a reasonable basis for doing so. In fact, Mr. Thomas's statement is silent on the material issue of whether the Jail adopted an intentionally discriminatory policy. *See Hudson v. Spencer*, 180 F. Supp. 3d 70, 84-85 (D. Mass. 2015) (concluding that the defendant prison officials were entitled to summary judgment on the plaintiffs § 1983 equal protection claims asserting differential treatment on the basis of religion where the plaintiff failed to offer any evidence that differential treatment between Nation of Islam inmates and Sunni Muslim inmates was based on their religion and where defendants submitted affidavits showing their actions were motivated by financial and security concerns); *Winder v. Maynard*, 2 F. Supp. 3d 709, 716 (D. Md. 2014) (concluding that a prisoner's equal protection claim failed as a matter of law where there was no showing that the defendant discriminated against him because of his religion despite alleged differences in dietary treatment between Wiccan prisoners and those of other faiths). For these reasons, the Court concludes that the defendants are entitled to judgment as a matter of law on Mr. Thomas's equal protection claim concerning the denial of Islamic worship materials.

## CONCLUSION

Desean Thomas argues that the defendants failed to honor his religious freedom during his time at the Dakota County Law Enforcement Center. However, the record before the Court demonstrates that summary judgment in favor of the defendants is appropriate. The relevant evidence is undisputed and indicates that: (1) the Jail's policies relating to religious gathering and worship materials that Mr. Thomas challenges are reasonably related to legitimate government interests, entitling the defendants to judgment as a matter of law on his free exercise claims; and (2) the defendants did not subject him to differential treatment because of intentional or purposeful discrimination, entitling them to judgment as a matter of law on his equal protection claims.

For these reasons, the Court makes the following **RECOMMENDATION**.

1. Plaintiff's Motion for Partial Summary Judgment **[ECF No. 171]** should be **DENIED**.

2. Defendants' Motion for Summary Judgment **[ECF No. 178]** should be **GRANTED**.

3.  Plaintiff's other pending motions **[ECF Nos. 188 and 191]** should be **DENIED**.

4.  This action should be **DISMISSED WITH PREJUDICE**.

Date: May 8, 2017                          *s/ Katherine Menendez*
                                           Katherine Menendez
                                           United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.